**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------------X
NINA HORTON,

                                                 **16 CV 4595**

                *Plaintiff*,

      -against-                              **COMPLAINT**

GREENEBUILD LLC, DONALDSON INTERIORS, INC.,
DONALDSON ACOUSTICS CO., INC., ALL CRAFT
FABRICATORS, INC., and DONAMO INTERNATIONAL, LLC,

                *Defendants*.
-----------------------------------------------------------------------------X

      Plaintiff Nina Horton, by her counsel, The Harman Firm, LLP, alleges for her complaint against Defendant Greenebuild LLC, Defendant Donaldson Interiors, Inc., Defendant Donaldson Acoustics Co., Inc., Defendant All Craft Fabricators, Inc., and Defendant Donamo International, LLC as follows:

## NATURE OF THE ACTION

      1.    Plaintiff Nina Horton ("Plaintiff" or "Ms. Horton") seeks damages and costs against Defendant Greenebuild LLC ("Defendant Greenebuild" or "Greenebuild"), Defendant Donaldson Interiors, Inc., Defendant Donaldson Acoustics Co., Inc., Defendant All Craft Fabricators, Inc., and Defendant Donamo International, LLC (hereinafter Defendants Donaldson Interiors, Inc., Donaldson Acoustics Co., Inc., All Craft Fabricators, Inc., and Donamo International, LLC are collectively referred to as "Donaldson Defendants" or "Donaldson") (hereinafter all defendants are collectively referred to as "Defendants") for discriminating against her based on her race (African-American) by subjecting her to a hostile work environment, retaliating against her for her complaints of discrimination, and ultimately unlawfully

1

terminating her employment, in violation of § 1981 of the Civil Rights Act of 1866 ("§ 1981") and the New York City Human Rights Law ("NYCHRL").

2. Plaintiff also seeks damages and costs against Defendants for discriminating against her based on her gender, age, and disability by subjecting her to a hostile work environment, retaliating against her for her complaints of discrimination, and ultimately unlawfully terminating her employment, in violation of the NYCHRL.

3. Plaintiff also seeks damages and costs against Defendants for failing to engage in the mandatory interactive process to identify a reasonable accommodation, in violation of the NYCHRL.

4. Plaintiff also seeks damages and costs against Defendant Greenebuild for failing to pay her at the overtime premium rate for hours worked in excess of forty (40) in a workweek, in violation of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL").

## JURISDICTION AND VENUE

5. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over Plaintiff's claims, as they arise under the FLSA and § 1981.

6. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's claims brought under the NYLL and the NYCHRL, as those claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

7. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Eastern District of New York as a substantial part of the events giving rise to the claims occurred within this District.

## TRIAL BY JURY

8. Plaintiff respectfully requests a trial before a jury.

## PARTIES

9. At all times relevant hereto, Plaintiff was and is a resident of Kings County in the State of New York.

10. Upon information and belief, at all times relevant hereto, Defendant Greenebuild was and is a limited liability company organized under the laws of the State of New York with its principal place of business at 390A Lafayette Avenue, Brooklyn, NY 11238.

11. Upon information and belief, at all times relevant hereto, Defendant Donaldson Interiors, Inc., was and is a domestic business corporation organized under the laws of the State of New York with its headquarters at 150 Wireless Blvd., Hauppauge, New York, 11788.

12. Upon information and belief, at all times relevant hereto, Defendant Donaldson Acoustics Co., Inc., was and is a domestic business corporation organized under the laws of the State of New York with its headquarters at 150 Wireless Blvd., Hauppauge, New York, 11788.

13. Upon information and belief, at all times relevant hereto, Defendant All Craft Fabricators, Inc., was and is a domestic business corporation organized under the laws of the State of New York with its headquarters at 150 Wireless Blvd., Hauppauge, New York, 11788.

14. Upon information and belief, at all times relevant hereto, Defendant Donamo International LLC was and is a limited liability company organized under the laws of the State of New York with its headquarters at 150 Wireless Blvd., Hauppauge, New York, 11788.

## STATEMENT OF FACTS

15. In and around June 2013, Ms. Horton had several interviews with Frank Bilotto, (Donaldson's CFO) for a Full Charge Bookkeeper ("FC Bookkeeper") position at Donaldson.

16. However, after meeting with Ms. Horton, Mr. Bilotto told Ms. Horton that he believed she would be better suited for a position at Greenebuild and recommended her for a FC Bookkeeper position at Greenebuild.

17. On June 30, 2013, Greenebuild hired Ms. Horton as a FC Bookkeeper. Greenebuild paid Ms. Horton an annual salary of fifty thousand dollars ($50,000), plus benefits including medical and dental insurance, sick leave, personal days, and two (2) weeks' paid vacation after an initial probationary period of ninety (90) days.

18. Ms. Horton was told that her job responsibilities as a FC Bookkeeper would include handling all accounting duties for Greenebuild, including overseeing accounts payable, payroll, and tax returns.

19. On July 10, 2013, Ms. Horton started work for Greenebuild, though her office was in a Long Island City office building located at 2-07 Borden Ave. that was owned and used by Donaldson.

20. Ms. Horton experienced severe discrimination and harassment based on her gender and race throughout her employment with Defendants.

21. Ms. Horton was the only female employee at Greenebuild and one of only two (2) African-American employees, the other being Winston Greene (Greenebuild's President), who was rarely in the Greenebuild office.

22. Greenebuild is registered with the State of New York as a "Minority Business Enterprise."

23. Upon starting work at Greenebuild, Ms. Horton quickly realized that the work she was expected to perform did not match the job description that she had been given: she was not

actually responsible for any of Greenebuild's financials and was allowed only to handle certified payroll paperwork, answer phones, and mail checks.

24. Ms. Horton learned that, in reality, the job functions which she had purportedly been hired to perform were actually being fulfilled by thirteen (13) employees at Donaldson.

25. It became clear that Donaldson effectively controlled Greenebuild. Ms. Horton, though nominally a Greenebuild employee, worked out of Donaldson's offices, interacted with Donaldson's Human Resources ("HR") and other staff, reported to Donaldson executives, and observed the extent to which Donaldson was involved in Greenebuild's day-to-day operations.

26. Despite these changes to her job description, however, Ms. Horton was a dedicated employee who consistently fulfilled her job responsibilities. In October 2013, she passed her probationary period with no warnings, write-ups, or discipline of any kind.

27. Upon passing her probationary period, Ms. Horton was told by Mr. Bilotto and Bernadette Berretta (Donaldson's Human Resources ("HR") Director) that she would receive a bonus in December 2013, as would all other non-executive Greenebuild employees.

28. However, when bonuses were distributed in December 2013, Ms. Horton found that she was the only Greenebuild non-executive employee who had not received a bonus.

29. Ms. Horton asked Ms. Berretta why she had not received the bonus which she had been promised and which other Greenebuild employees (all of whom were male, and none of whom were African-American) had received.

30. Ms. Berretta responded that Donaldson had given Greenebuild a lump sum to distribute evenly to all non-executive employees, which should have included Ms. Horton.

31. Ms. Horton then asked Richard Maldonaldo, Greenebuild's Office Manager, about the missing bonus.

32. Mr. Maldonaldo told Ms. Horton that Mr. Greene had instructed him not to inform her that Greenebuild had received a bonus check, as he intended to divide her share of the bonus disbursement among the other Greenebuild employees.

33. Mr. Greene later told Ms. Horton that no employees had received a bonus that month, though Ms. Horton knew, as Ms. Berretta and Mr. Maldonaldo had confirmed, that this was untrue.

34. On December 4, 2013, Ms. Horton was in an accident at work in the Donaldson building, wherein she fell down the stairs and sustained several severe injuries to her legs, back, wrist, and head, which significantly impacted her ability to walk and perform other major life activities.

35. Ms. Horton requested approval to use her two (2) weeks' paid vacation time to go to the doctor and recover from the accident.

36. However, Defendants refused to allow Ms. Horton to use her vacation time. Instead, Greenebuild gave Ms. Horton a check for the monetary value of her vacation time and deducted any days of work that she missed due to her injuries from her salary.

37. In addition, when Ms. Horton made a request to file a worker's compensation claim regarding her workplace accident, Defendants instructed her to "wait" indefinitely to file the claim, as filing the claim would "raise their rates."

38. Defendants' employees made racially motivated, derogatory jokes and remarks on a daily basis.

39. For example, Defendants' employees regularly made racist jokes about Ms. Horton, addressed Ms. Horton using racial slurs, and openly displayed an offensive caricature depicting President Obama as a monkey in the office.

40. When discussing an upcoming contract job for a minority-owned company, a Greenebuild construction worker said, "We don't do this slave shit," to which another Greenebuild construction worker responded, "Hand that shit to the monkey black girl [referring to Ms. Horton] and she'll give it to that office nigger [referring to Mr. Greene]."

41. Ms. Horton was deeply offended by these comments and immediately reported the discriminatory conduct to her supervisors at Greenebuild and Donaldson.

42. When Ms. Horton complained to Mr. Maldonaldo about the overtly racist remarks, Mr. Maldonaldo did nothing to address the employees' discriminatory behavior and told Ms. Horton, "Don't pay them any attention – that's just how the construction guys talk."

43. Ms. Horton then contacted Ms. Berretta, who dismissed her complaint and responded only, "Oh, hell, they were just joking."

44. Jason Love, a construction worker at Greenebuild, became angry at Ms. Horton and began to verbally abuse her over the phone, making hostile, racist comments.

45. Ms. Horton reported this incident as well, but was again met with the response, "That's just how those guys talk."

46. In and around early 2014, shortly after Ms. Horton's workplace accident and her complaints to Mr. Maldonaldo and Ms. Berretta, Defendants' discriminatory treatment of Ms. Horton escalated, and Ms. Horton began to experience relentless, vicious discrimination and harassment based on her race, gender, age, and disability.

47. Ms. Horton was constantly referred to as "dumb black bitch," "fucking idiot," and "the old black lady."

48. Defendants' employees frequently made insulting, discriminatory remarks to Ms. Horton, such as "This is why we don't hire blacks to do anything but answer the phones," "If

[Defendants] had hired a young white girl, this work would be done," and "Do I have to translate into hip hop for you to understand?"

49. Ms. Horton was also required to adhere to strict rules and deadlines that did not apply to other employees.

50. For example, Ms. Horton's supervisors would regularly assign her lengthy reports at 5:00 p.m. that were due the following morning. In order to finish such assignments, Ms. Horton often had to stay at the office until 2:00 a.m or later. No other Greenebuild employees were asked to stay late or complete assignments on such short notice.

51. Ms. Horton was frequently reprimanded for fabricated infractions, such as not completing tasks that she had never been assigned.

52. When Ms. Horton's supervisors reprimanded her for these fabricated infractions, they would blame the alleged deficiencies on her race, age, gender, and disability.

53. When Ms. Horton's coworkers noticed her struggling to work with a defective computer, they laughed and taunted her, calling her "the old black lady."

54. Ms. Horton was also required to work longer hours than other Greenebuild employees.

55. Ms. Horton regularly arrived at the office between 8:00 a.m. and 9:00 a.m. and did not leave the office until between 8:00 p.m. and 10:00 p.m.; consequently, she regularly worked over sixty (60) hours per week. Ms. Horton was the only employee in her office who regularly worked more than forty (40) hours per week.

56. Throughout her employment, Greenebuild failed to pay Ms. Horton at the overtime premium rate for hours worked in excess of forty (40) in a workweek.

57. Greenebuild's failure to compensate Ms. Horton at the overtime premium rate for hours worked in excess of forty (40) in a workweek was the result of Greenebuild's erroneous misclassification of Ms. Horton as exempt from the overtime requirements of the FLSA. Greenebuild classified Ms. Horton as exempt, yet her position did not meet any of the exemptions under the FLSA or NYLL.

58. Ms. Horton had little to no autonomy: her work was closely supervised by Defendants, who assigned her responsibilities on a day-to-day basis.

59. Ms. Horton did not have hiring and firing power, nor did she have supervisory or decision-making authority.

60. In January 2014, Greenebuild relocated from the Donaldson office building in Long Island City to a new location in Brooklyn in a building owned by Mr. Greene.

61. In January 2014, Ms. Horton was the only Greenebuild employee who was required to come in during a major blizzard. All other Greenebuild employees were excused for multiple days and were paid in full, yet Ms. Horton was told that if she missed work, she would be terminated immediately.

62. Since no public transportation was running during the blizzard, Ms. Horton was forced to walk to the Greenebuild office. Walking to work, particularly in such severe weather conditions, was extremely painful for Ms. Horton, as it exacerbated the injuries she had sustained the previous month in her workplace accident.

63. Ms. Horton had had a printer on her desk for her personal use since she first began working at Defendants. However, in or around January and February 2014, shortly after her workplace accident, Ms. Horton's printer was disconnected without explanation, and she was told that she would now have to use another printer in the Greenebuild office.

64. The printer that Ms. Horton was instructed to use was in a separate part of the Greenebuild office building, and Ms. Horton was required to walk up and down three (3) flights of stairs each time she needed to print a document, which was very difficult due to her disability.

65. Ms. Horton contacted Mr. Bilotto, Ms. Berretta, and her direct supervisor, Mike Carroll, to request that she be allowed to use her desktop printer (as she had always been allowed to do in the past) to accommodate her disability.

66. However, neither Mr. Bilotto, Ms. Berretta, nor Mr. Carroll responded to Ms. Horton. Instead, they forwarded Ms. Horton's request to Mr. Maldonaldo, whose only response was, "If you can't do the job, then maybe you would do better elsewhere."

67. In February 2014, Mr. Love came into the office while Ms. Horton was working and said, "They need to get someone new, maybe a nice young white girl. She's [referring to Ms. Horton] too old to keep up with the job."

68. Even Mr. Greene, the only other African-American at Greenebuild, participated in the harassment of Ms. Horton, stating several times that he wanted "a younger white girl in [Ms. Horton's] seat" because a younger white woman "would never have wanted to file a worker's comp claim" and would "make the office much brighter and more professional-looking."

69. As a result of the constant discrimination and harassment she faced, as well as the ever-increasing amounts of work she was expected to do, Ms. Horton began to suffer severe stress, exhaustion, depression, and anxiety. She regularly went home crying at the end of the day and began to fear going to work.

70. On March 19, 2014, Edward Breeyear, Safety Manager for Defendants, instructed Ms. Horton to lie about the date that her workplace accident had occurred, telling her that, if she

did not, she would be unable to receive medical attention. Ms. Horton told Mr. Breeyear that she would not do so.

71. The following day, March 20, 2014, Ms. Horton received a call from Cindy-Jo Aptheker (Donaldson's General Counsel), who asked Ms. Horton to confirm that she was refusing to "change the date" of her accident.

72. When Ms. Horton confirmed that she was refusing, Ms. Aptheker told Ms. Horton that she was "not a team player" and stated, "What the company needs is someone who's on the team, not fighting for the team to lose."

73. Ms. Horton responded that it was not her intention to go against the "team," but that she was not comfortable following a directive that she knew to be dishonest and unlawful.

74. On March 21, 2014, the day after Ms. Horton's call with Ms. Aptheker, Ms. Horton was called into Mr. Greene's office, where Mr. Greene and Dan Demott (Greenebuild's Senior Project Manager) told her that her employment was being terminated, stating only, "This isn't working out."

75. When Ms. Horton asked for an explanation, Mr. Greene stated that Ms. Horton was being let go because she "became disabled" and because the company needed a "younger person to fill [her] seat." Mr. Greene claimed that Ms. Horton's disability was an "issue for the company," as was the fact that she "needed to take care of a disabled child" (Ms. Horton's granddaughter, who lives with Ms. Horton, is disabled).

76. Mr. Greene then handed Ms. Horton a proposed severance agreement. Ms. Horton noticed an error in the document: namely, the amount of severance pay offered to her verbally was inconsistent with what was offered in the proposed agreement. Consequently, she

stated that she would need to see a corrected, consistent version of the agreement before she would agree to sign.

77. In response, Mr. Greene asked Ms. Horton why she was questioning the document, took the agreement out of her hand, signed it, and instructed her to sign, as well.

78. When Ms. Horton reiterated that she would not sign the document until she received a corrected version, Mr. Greene responded, "Take the money, Nina. You can't do any better – who's going to hire you in your condition?"

79. When Ms. Horton left Mr. Greene's office after the meeting in which she was terminated, Mr. Demott told Ms. Horton that "[her] kind" were not a "fit" for Defendants.

## CAUSES OF ACTION
### FIRST CAUSE OF ACTION
### Hostile Work Environment in Violation of § 1981
### (Against All Defendants)

80. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 79 with the same force as though separately alleged herein.

81. § 1981 prohibits employers from discriminating against an employee in terms, conditions or privileges of employment on the basis of race.

82. Defendants discriminated against Plaintiff by treating her less well than her non–African-American counterparts and subjecting her to offensive, racially motivated comments that were so severe and pervasive that they altered the terms, conditions, or privileges of her employment.

83. As a direct and proximate consequence of Defendants' race discrimination, Plaintiff has suffered, and continues to suffer, substantial economic damages, including, but not limited to, back pay and front pay, as well as emotional distress and suffering, all in amounts to be determined at trial.

84. Defendants' discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants.

**SECOND CAUSE OF ACTION**
**Unlawful Termination in Violation of § 1981**
**(Against All Defendants)**

85. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 84 with the same force as though separately alleged herein.

86. § 1981 prohibits employers from discriminating against an employee in terms, conditions or privileges of employment on the basis of race.

87. Defendants terminated Plaintiff's emplyoment because of her race.

88. As a direct and proximate consequence of Defendants' discriminatory conduct, Plaintiff has suffered, and continues to suffer, substantial economic damages, including, but not limited to, back pay and front pay, as well as emotional distress and suffering, all in amounts to be determined at trial.

89. Defendants' discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants.

**THIRD CAUSE OF ACTION**
**Retaliation in Violation of § 1981**
**(Against All Defendants)**

90. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 89 with the same force as though separately alleged herein.

91. § 1981 prohibits employers from retaliating against any employee for making a complaint of racial discrimination.

92. Plaintiff properly complained to Defendants about racial discriminators' comments and conduct.

93. Defendants retaliated against Plaintiff by, *inter alia,* subjecting her to further offensive, racially motivated harassment, refusing to reprimand the discriminatory behavior, and ultimately terminating her employment.

94. As a direct and proximate consequence of Defendants' retaliation, Plaintiff has suffered, and continues to suffer, substantial economic and non-economic damages, including, but not limited to, back pay and front pay, as well as emotional distress and suffering, all in amounts to be determined at trial.

95. Defendants' discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants.

**FOURTH CAUSE OF ACTION**
**Hostile Work Environment in Violation of the NYCHRL**
**(Against All Defendants)**

96. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 95 with the same force as though separately alleged herein.

97. The NYCHRL prohibits employers from discriminating against an employee in terms, conditions or privileges of employment on the basis of race, gender, age, and/or disability.

98. Defendants discriminated against Plaintiff by subjecting her to offensive comments based on her race, gender, age, and disability and treating her less well than her non–African-American, male, and/or non-disabled counterparts.

99. As a direct and proximate consequence of Defendants' discriminatory conduct, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

100. Defendants' discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants.

## FIFTH CAUSE OF ACTION
### Unlawful Termination in Violation of the NYCHRL
**(Against All Defendants)**

101. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 100 with the same force as though separately alleged herein.

102. The NYCHRL prohibits employers from discriminating against an employee in terms, conditions or privileges of employment on the basis of race, gender, age, and/or disability.

103. Defendants terminated Plaintiff because of her race, gender, age, and disability.

104. As a direct and proximate consequence of Defendants' discriminatory conduct, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

105. Defendants' discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants.

## SIXTH CAUSE OF ACTION
### Retaliation in Violation of the NYCHRL
**(Against All Defendants)**

106. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 105 with the same force as though separately alleged herein.

107. The NYCHRL prohibits employers from retaliating against any employee for complaining about discriminatory practices illegal under the NYCHRL.

108. Plaintiff properly complained to Defendants about discriminators' comments and conduct.

109. Defendants retaliated against Plaintiff by, *inter alia,* subjecting her to further offensive comments and harassment, refusing to reprimand the discriminatory behavior, and ultimately terminating her employment.

110. As a direct and proximate consequence of Defendants' retaliation, Plaintiff has suffered, and continues to suffer, substantial economic damages.

111. Defendants' discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants.

**SEVENTH CAUSE OF ACTION**
**Failure to Engage in the Interactive Process to Provide a Reasonable Accommodation in Violation of the NYCHRL**
**(Against All Defendants)**

112. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 111 with the same force as though separately alleged herein.

113. The NYCHRL mandates that an employer engage in an interactive process to provide a reasonable accommodation for an employee's disability.

114. Defendants repeatedly refused to respond to Plaintiff's requests for a reasonable accommodation and, in fact, retaliated against her for making such requests by, among things, subjecting her to further discriminatory treatment and ultimately terminating her employment.

115. As a direct and proximate consequence of Defendants' failure to provide a reasonable accommodation, Plaintiff has suffered, and continues to suffer, substantial damages,

including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

116. Defendants' discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants.

**EIGHTH CAUSE OF ACTION**
**Failure to Pay Overtime Wages in Violation of the FLSA**
**(Against Defendant Greenebuild)**

117. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 116 with the same force as though separately alleged herein.

118. At all times relevant hereto, Plaintiff was employed by Defendant Greenebuild within the meaning of the FLSA.

119. Throughout Plaintiff's employment with Defendant Greenebuild, she regularly worked in excess of forty (40) hours in a workweek.

120. The work that Plaintiff performed for Defendant Greenebuild did not meet any of the exemptions under the FLSA.

121. Defendant Greenebuild willfully misclassified Plaintiff as exempt and failed to pay her at the applicable overtime rate for hours worked in excess of forty (40) in a workweek, in contravention of the requirements of the FLSA.

122. Defendant Greenebuild's willful failure to compensate Plaintiff at a rate not less than one and one-half (1.5) times the regular rate of pay for hours worked in excess of forty (40) in a workweek violates the FLSA.

123. Due to Defendant Greenebuild's willful violation of the FLSA, Plaintiff is entitled to recover from Defendant Greenebuild her unpaid overtime compensation, liquidated damages, attorneys' fees, and costs and disbursements of this action.

**NINTH CAUSE OF ACTION**
**Failure to Pay Overtime Wages in Violation of the NYLL**
**(Against Defendant Greenebuild)**

124. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 123 with the same force as though separately alleged herein.

125. At all times relevant hereto, Plaintiff was employed by Defendant Greenebuild within the meaning of the NYLL.

126. Defendant Greenebuild willfully violated Plaintiff's rights under the NYLL by failing to compensate her at a rate not less than one and one-half (1.5) times the regular rate of pay for hours worked in excess of forty (40) in a workweek violates the FLSA.

127. Due to Defendant Greenebuild's willful violation of the FLSA, Plaintiff is entitled to recover from Defendant Greenebuild her unpaid overtime compensation, liquidated damages, attorneys' fees, and costs and disbursements of this action.

## REQUESTS FOR RELIEF

**WHEREFORE**, the individually named Plaintiff respectfully requests that this Court grant the following relief:

A. on Plaintiff's first claim, actual damages to be determined at trial, but in no event less than $250,000;

B. on Plaintiff's second claim, actual damages to be determined at trial, but in no event less than $250,000;

C. on Plaintiff's third claim, actual damages to be determined at trial, but in no event less than $250,000;

D. on Plaintiff's fourth claim, actual damages to be determined at trial, but in no event less than $250,000;

E. on Plaintiff's fifth claim, actual damages to be determined at trial, but in no event less than $250,000;

F. on Plaintiff's sixth claim, actual damages to be determined at trial, but in no event less than $250,000;

G. on Plaintiff's seventh claim, actual damages to be determined at trial, but in no event less than $250,000;

H. on Plaintiff's eighth claim, damages to be determined at trial;

I. on Plaintiff's ninth claim, damages to be determined at trial;

J. an award of pre-judgment and post-judgment interest;

K. an award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

L. such other and further relief as this Court deems appropriate.

[SIGNATURE ON FOLLOWING PAGE]

Dated: New York, New York
August 17, 2016

By: _____
Walker G. Harman, Jr. [WH-8044]
Owen H. Laird [OL-6994]
THE HARMAN FIRM, LLP
*Attorneys for Plaintiff*
220 Fifth Ave., Suite 900
New York, New York 10001
(212) 425-2600
wharman@theharmanfirm.com
olaird@theharmanfirm.com